IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| v. | * | **CRIMINAL NO.** |
| | * | **8:24-cr-00187-LKG** |
| **FODE SITAFA MARA** | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| ******* | | |

**MEMORANDUM IN SUPPORT OF**
**GOVERNMENT'S MOTION FOR PRETRIAL DETENTION**

The United States, by and through the undersigned counsel, submits this Memorandum in support of its motion for pretrial detention based on the Defendant's serious risk of flight and danger to the community, including a high likelihood he will attempt to obstruct justice. No release conditions will reasonably assure the Defendant's appearance and ensure the safety of the community. For the reasons set forth herein, the Court should order the pretrial detention of the Defendant.

I. PROCEDURAL BACKGROUND

On June 6, 2024, a grand jury indicted the defendant on seven felony counts: five counts of Aggravated Sexual Abuse of a Minor in violation of 18 U.S.C. § 2241(c); one count of Coercion and Enticement of a Minor in violation of 18 U.S.C. § 2422(b); and one count of Obstruction of Justice in violation of 18 U.S.C. § 1512(c)(2). The Defendant made his initial appearance on June 10, 2024, before Magistrate Judge Timothy J. Sullivan. The government moved for detention, and the Defendant, who had obtained new counsel that day, requested that the detention hearing be continued to provide the defense adequate time to prepare. The Court scheduled the detention hearing for June 14, 2024.

## II.   FACTUAL BACKGROUND

Defendant Fode Mara was born and raised in Guinea. He married an American woman, now employed by the U.S. Agency for International Development (USAID) and through that marriage obtained U.S. citizenship. Mara has a valid American passport and as recently as 2019 had a Guinean passport.

In August 2022, Mara's wife began a two-year assignment in Ouagadougou, Burkina Faso, and Mara accompanied her there. Mara's wife has a diplomatic status and as her official travel orders include Mara, he too travels on a diplomatic passport and holds the same status. At some point after his arrival in Ouagadougou, Mara got a job at the U.S. Embassy.

Prior to leaving the U.S. for Burkina Faso, Mara and his wife lived in Takoma Park, Maryland. Mara maintains an active Maryland driver's license and voter registration, both of which list his Takoma Park address. When Mara and his wife arrived in Burkina Faso, they began residing in a house leased by the U.S. Embassy for its personnel. The Embassy designates this residence "R-12." All of the criminal conduct for which Mara was indicted occurred at the R-12 residence.[1]

Minor Victim 1 (MV-1), born 2008, and Minor Victim 2 (MV-2), born 2009, are local Burkinabe girls who live close to R-12 and had a relationship with the previous American residents of R-12. In August 2022, at the urging of the previous R-12 residents, MV-1 and MV-2 introduced themselves to Mara and his wife, who quickly developed their own close relationship with the

---

[1] The R-12 residence falls under the Special Maritime and Territorial Jurisdiction of the United States, pursuant to 18 U.S.C. § 7(9), which covers "premises of United States diplomatic, consular, military, or other United States Government missions or entities in foreign States," and "residences in foreign States . . . irrespective of ownership, used for purposes of those missions or entities or used by United States personnel assigned to those missions or entities." Venue for this case lies in the District of Maryland, which is the "district of the last known residence of the offender." 18 U.S.C. § 3238.

victims and their family members. The victims would later disclose that Mara began sexually abusing them as early as the second time they interacted with him.

It was not until October 2023, however, that American authorities were notified that Mara might be abusing the victims. One of the guards assigned to R-12 stated to U.S. Embassy Regional Security Office (RSO) investigators that he and Mara's housekeeper both had concerns about Mara bringing MV-1 and MV-2 to the residence when Mara's wife was away. The guard reported that the victims would enter the house and remain inside with Mara, and sometimes they would leave the residence looking upset or appearing that they had changed clothes or taken a shower.

The housekeeper was separately interviewed and confirmed that she was also concerned. She, too, recalled Mara bringing MV-1 and MV-2 to the residence when his wife was away. She recalled seeing Mara once touch MV-1 on the buttocks and seeing Mara alone in bedrooms of the house with one victim or the other. She once walked in on Mara sitting on a bed with MV-1 and appeared to startle him, causing him to move quickly away from MV-1. The housekeeper also observed that whenever Mara's spouse would call to say she was coming home, the victims would leave before she returned.

On October 25, 2023, the housekeeper notified RSO staff of evidence that Mara had sex with MV-1 at the residence the previous day. The housekeeper did not live at R-12 but had her own quarters within the residence, consisting of a bedroom and bathroom. When she left work on October 23, her quarters were in good order. She was off work on October 24. When she arrived back to work the morning of October 25, she noticed that her bed had been remade differently, as if someone had slept in it. She also noticed a condom floating in her toilet. RSO investigators retrieved the condom and later had it tested for DNA. Mara was the only identifiable contributor,

and no female DNA profile was found on the condom.[2] The guard logs for R-12 showed that on October 24, Mara and MV-1 were alone in the house in the middle of the day while Mara's wife and the housekeeper were away.

From October 26 to November 12, 2023, Mara and his wife were on vacation in Vietnam. On November 13, 2023, investigators approached Mara at the U.S. Embassy, and he agreed to be interviewed. He acknowledged that he had a close relationship with MV-1 and MV-2, calling them his "family," and acknowledged that both victims were minors. He denied having a sexual relationship with either girl. When confronted about the condom in the residence, he claimed he used the condom while having sex with the housekeeper in her quarters. When asked by investigators, the housekeeper denied having an affair with Mara.

During the interview, Mara consented to a search of his personal and work cell phones. On the work phone, investigators found a WhatsApp chat between Mara and another number. A review of the subscriber information for the other number found it to be registered to MV-1's mother. Later, MV-1 told investigators the phone number was to her phone.

In the WhatsApp chat, MV-1 sent Mara a link to a "Lovetest" application on the Google Play Store. The image was of a red heart, showing a compatibility/match score of 71 percent, and showing Mara's and MV-1's name on either side.

In that same chat, on November 5, 2023, Mara sent messages with an apparent reference to a prior sex encounter with MV-1 at his house. Mara stated (as translated from French), "You

---

[2] The laboratory report states that semen was found on the condom and that the testing personnel swabbed both the inside and outside of the condom for DNA evidence. A single male profile was developed from those swabs and was "110 septillion times more likely if MARA is a contributor than if an unknown, unrelated person is a contributor." MV-1, MV-2, and the housekeeper were excluded as possible contributors.

know I can't bear it when I am with you and why, or are you refusing." MV-1's response was, "How," to which MARA stated, "For instance, last time, before my trip, at my house."

Mara also sent messages that indicate enticement to additional sexual activity; on November 5, 2023, Mara sent a Graphic Interchange Format (GIF) image of an adult male and adult female having sex and a message commenting on that GIF image, "I hope it will not be simple words this time."

Mara sent an additional message on November 7, 2023, stating, "Ok, when you will get home, please take a picture before you finish taking your bath and send it to me in order to relax myself a bit."[3] The chat also contains suspected plans to engage in sexual activity once Mara returned from his trip, with MV-1 stating on November 7, 2023, "I really want you" and "Can we have sex when you get back." Mara responds with, "You promise?" MV-1 says "Yes, I am very hungry, I will talk to you later." Mara responds, "Ok, it's promised."

Pursuant to a search warrant, investigators further searched Mara's work phone and found text message conversations between Mara and MV-1. On November 12, 2023, Mara sent a message saying he was at the house, that his spouse would depart the following morning, and that Mara would like to spend that whole night with MV-1 but that it would have to wait until the following day. GPS data from Mara's personal cell phone showed that he was at the R-12 residence when he sent these messages from his work phone.[4]

Immediately after being interviewed by investigators on November 13, 2023, Mara asked his housekeeper to say they were having an affair and that the condom in her toilet was from sex

---

[3] Investigators could see that MV-1 sent numerous photos to Mara during the WhatsApp chat, but Mara had deleted the photos from his phone. Because MV-1's phone was never recovered, authorities have been unable to see what was depicted in the photos.

[4] These messages are the basis for Count 3.

they had together. The housekeeper told Mara she would not lie for him and then reported the conversation to RSO staff. Guard logs show that later that day, Mara brought MV-1 into the R-12 residence for a brief period while his wife was away.

Investigators also seized Mara's personal phone and a laptop computer, then obtained warrants to search those devices. Mara's internet search history showed that he has a sexual interest in early-teen girls and has sought child sexual abuse material (i.e., child pornography) depicting girls of that age. On Mara's personal cell phone, investigators found Google searches, dated November 5, 2023, for "sex age 14 or 15 girls" and "sex age 14 or 15 girls porno." On Mara's laptop, investigators found evidence that on December 19, 2022, he searched for "PORNO WITH 14 YEAR OLD GIRLS," and then accessed videos entitled "14 year old Latina beautiful girl" and "14 year old Boy vs 12 year old girl ( my sister)."

In April 2024, investigators participated in an interview of MV-1 and MV-2, who began to disclose that Mara had sexually abused them. Among other disclosures, MV-1 recounted that at one point, her mother fell ill and she asked Mara for help paying for her medical care. In response, Mara whispered in her ear, "I can't help you for free."

The victims recounted multiple instances of Mara committing acts of abuse. MV-2 recalled that on her second encounter with Mara in August or September 2022, he grabbed her by the breast. MV-1 recalled Mara first touched her breast sometime after her second encounter with him, within a month of their first meeting. MV-2 recalled that Mara would have her come to his house most Tuesdays, when she was out of school and Mara's wife was at work, and that Mara would try to touch her sexually every time she was there.

The victims stated that Mara bought them cell phones, which they used to communicate with him. After he was interviewed in this investigation and before leaving Burkina Faso in

November 2023, Mara came to speak to the victim's mother; he then took the phones away from the victims, saying that he would give them to someone he knew for safe keeping. To date, the victims' phones have not been found. The victims also stated that Mara provided them with money, which was corroborated by evidence on Mara's phone showing electronic money transfers to MV-1 and MV-2.

The abuse in this case was frequent and encompasses a period of at least one year. The basis for the § 2241(c) charges in the indictment are briefly outlined below:

**Count 1:** Sometime between March 8, 2023, and June 28, 2023, Mara had MV-1's mother send her to the house. Mara told MV-1 he needed her, lured her to the bedroom, and then asked her to remove her clothes. MV-1 refused, so Mara started to undress her. MV-1 pulled away and tried to take Mara's hands off of her while pleading with him to stop. Mara slapped MV-1's hands away and continued. Mara laid MV-1 on the bed and began penetrating her vagina with his penis, but because MV-1 was a virgin, she was in pain and began writhing beneath him. Mara physically grabbed MV-1 and flipped her onto her belly, then fully penetrated her with her penis, causing her to bleed considerably from her vagina. MV-1 ran to the bathroom while bleeding. Mara followed, and when MV-1 eventually emerged from the bathroom, he told her not to tell anyone about what had happened and promised to buy her parents a white goat as a gift.

**Count 2**: On or about October 24, 2023, shortly before Mara was to leave on vacation, he brought MV-1 to his house and told her, "I want you before I travel." He brought her to the housekeeper's quarters and began touching her all over her body. MV-1 told him to stop and said she did not want it. In response, Mara told her to stop and to let him do it. Mara took off all of her clothes and all of his own. At some point, Mara put on a condom. Mara pushed MV-1 onto the bed, causing her to lie down. MV-1 felt Mara touch his penis against her vagina, then tried to

penetrate her, but she was in pain and refused. Mara, angry with MV-1, took the condom off and threw it in the toilet but did not flush it.

**Count 4:** On a Tuesday between about November 5, 2022, and February 18, 2023, Mara called MV-2 into a bedroom and took off all of his clothes. He then unzipped MV-2's dress, which fell to the floor. With MV-2 nude, Mara pushed her onto the bed. She fell into a seated position, and then Mara pushed her the rest of the way down onto her back. MV-2 tried to get up, but Mara pushed her back down and said, "Stop, I will go slowly, I know you are not used to it." At some point Mara put on a condom and rubbed his penis against MV-2's vagina. Mara was on top of MV-2, putting his weight on her body. MV-2 then told him to stop and said she could not breathe. Mara then let her up and gave her 1,000 CFA (less than $2) in cash.

**Count 5:** Between November 5, 2022, and March 8, 2023, Mara called MV-2 from the living room into the kitchen, then brought her into the pantry, where he pinned her against the wall by her wrists, reached under her dress, and pulled down her underwear. Mara then pressed his erect penis against her vagina and moved it around in circles, then tried to penetrate her. MV-2 recounted that Mara could not penetrate her completely because she was a virgin, but she felt the force and pain of his penis against her vagina.

**Count 6:** Sometime in October 2023, Mara asked MV-2 to come to his house. She did not want to go, so she brought a young boy with her who was a friend from the neighborhood. When they arrived, Mara was upset that the boy was with her and asked why she brought someone else. They all went into the living room of the house and Mara turned on the TV. The boy sat on the floor watching TV, and Mara told MV-2 to sit next to him on the couch, which she did. Mara then held a pillow in front of their laps to block the boy's view of what was happening. Mara then reached around and dug his hand into the front of MV-2's pants. Mara reached under her

8

underwear, touching and slightly penetrating MV-2's vagina with his fingers. At that point, MV-2 tried to pull Mara's hand out, but Mara pushed it back down with his other hand. MV-2 recalled that because she could not physically remove Mara's hand, she let him finish.

MV-1 and MV-2 acknowledged that in some of their text messages to Mara, they seemed amiable toward him. Both stated they did this because they were seeking Mara's financial support.

## III.  ARGUMENT

The Defendant should be detained pending trial because there is no condition or combination of pretrial release conditions that would reasonably assure the safety of the community or the Defendant's appearance at further proceedings.

### A. Legal Standard

Pursuant to 18 U.S.C. § 3142(f), the Court "shall" hold a hearing to determine whether any condition or combination of conditions listed in section 3142(c) will reasonably assure *both* the Defendant's appearance as required *and* the safety of any other person and the community, provided the government moves for such a hearing in a case that involves one or more of the factors listed in section 3142(f)(1) and (2). Here, the government moves for a detention hearing because this case involves "a crime of violence," "an offense for which the maximum sentence is life imprisonment," "a serious risk that [the defendant] will flee," and "a serious risk that [the defendant] will obstruct or attempt to obstruct justice." 18 U.S.C. § 3142(f)(1)(A), (1)(B), (2)(A), and (2)(B).

In determining whether there are conditions of release that will reasonably assure the Defendant's appearance and the safety of the community, section 3142(g) requires the Court to consider: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and

9

seriousness of the danger "to any person or the community" that would be posed by the defendant's release. "A danger to the community need not be physical to weigh against a defendant's release" and may include the risk that the defendant will obstruct justice. *United States v. Gallman*, No. 14-CR-292-PWG-1, 2020 WL 3412995, at *3 (D. Md. June 22, 2020) (citing *United States v. LaFontaine*, 210 F.3d 125, 134 (2d Cir. 2000)). *See also LaFontaine*, 210 F.3d at 134 ("[O]bstruction of justice has been a traditional ground for pretrial detention by the courts, even prior to detention for dangerousness which was instituted by the Bail Reform Act of 1984."); *United States v. Lamar*, 600 F. Supp. 3d 714, 722 (E.D. Ky. 2022) ("Obstruction of a judicial process may constitute the sort of danger warranting pretrial detention under the BRA. Courts have concluded that even non-violent threats to the judicial process may constitute a sufficient danger in the BRA context."); *United States v. DeGrave*, 539 F. Supp. 3d 184, 199 (D.D.C. 2021) ("A threat of future dangerousness may be based on the risk that no conditions will reasonably prevent the defendant from obstructing justice.") (internal quotation omitted).

Under section 3142(f), the Court's finding that no condition or combination of conditions will "reasonably assure the safety of any other person and the community" must be supported by "clear and convincing evidence." But a finding that no condition or combination of conditions will reasonably assure the Defendant's appearance needs only proof by a preponderance of the evidence. *See, e.g.*, *United States v. Portes*, 786 F.2d 758, 76465 (7th Cir. 1985); *United States v. Davis*, 449 F. Supp. 3d 532, 534 (D. Md. 2020).[5]

---

[5] The Federal Rules of Evidence do not apply at a detention hearing, *see* 18 U.S.C. § 3142(f); Fed. R. Evid. 1101(d)(3), and both parties may proceed via attorney proffer, *see, e.g.*, *United States v. White*, Crim. No. PWG-13-0436, 2015 WL 2374229, at *2 (D. Md. May 15, 2015).

### B. Analysis of 18 U.S.C. § 3142(g) Factors

In this case, there is sufficient evidence for the Court to find that (1) by clear and convincing evidence the Defendant poses a danger to the community if released regardless of any conditions set by the Court; and (2) by a preponderance of the evidence, that no condition or combination of conditions will assure the Defendant's appearance at future proceedings in this Court.

### 1. Nature and Circumstances of the Offense

The nature and circumstances of the Defendant's offenses weigh heavily in favor of pretrial detention because they illustrate an extreme danger to the community. *See* 18 U.S.C. § 3142(g)(1).

The Defendant's crimes are as serious as any that can be alleged. They stand out even in the context of child exploitation offenses. Mr. Mara repeatedly forcibly raped two children over the course of more than a year. 18 U.S.C. 3142(g)(1) emphasizes "crimes of violence" and those that "involve[] minor children." Mara's crimes are both.

Mara's crimes cannot be characterized as momentary lapses in judgment or as brought about by temporary circumstances in his life. Far from it, Mara was born and brought up in West Africa. He more than anyone understands the desperate poverty that was the victims' circumstance and deliberately targeted them when the opportunity arose. As described in the factual summary, MV-1's mother fell ill and in a state of desperation MV-1 asked Mara for help in paying for her medical care. Mara was able to use his privileged position as an embassy official to help and immediately seized the opportunity to coerce and abuse. He pulled MV-1 aside and whispered in her ear, "I can't help you for free."

His repeated assaults against MV-1 and MV-2 are also a manifestation of his sexual interest in children. This is demonstrated clearly by his internet search history, which shows him searching for child pornography featuring victims the same age as MV-1 and MV-2. Mara's

11

actions against the victims were deliberate and predatory, and given his proclivity for young girls, his release would pose a grave danger to children in the community.

In addition to child sexual abuse, Mara is charged with obstructing justice, which demonstrates a separate danger he poses to the community: that is, he will try to interfere with the judicial process. The reality is that Mara has already attempted to obstruct justice on several occasions since the inception of this investigation. First, he tried to convince a key witness in this case (the housekeeper) to lie for him; second, he tried to convince MV-1 not to disclose the fact that he raped her, promising her family a gift in exchange for her silence; third, immediately after being interviewed by investigators about the allegations he sought out MV-1, bringing her over to his house and speaking to her for approximately ten minutes; fourth, that same day, he also went to the victim's house and spoke to the victim's mother, lamenting the fact that as a result of this situation he could end up being in jail; fifth, in the days prior to his departure from Burkina Faso, he met with the victims and took away their cell phones and entrusting them to someone so they would not be found. Those cell phone have never been recovered.

### 2. Weight of the Evidence Against the Defendant

The weight of the evidence against the Defendant is strong. MV-1 and MV-2 vividly and painfully provided multiple, detailed accounts of Mara forcing sexual acts upon them. Their accounts are corroborated by each other, by the guard and housekeeper's observations, by Mara's sexually explicit WhatsApp and text communications with MV-1, by guard logs and the condom found in the toilet, by Mara's internet searches showing a sexual interest in girls the same age as the victims, and by Mara's various attempts to cover up his crimes by concealing physical evidence and trying to manipulate witness testimony.

### 3. The Defendant's History and Characteristics

The Defendant's history and characteristics likewise support the finding that no condition or combination of conditions will reasonably assure the safety of the community or the Defendant's appearance as required. *See* 18 U.S.C. § 3142(g)(3).

The Defendant is originally from Guinea and maintains a Guinean passport – a fact Mara confirmed in his interview with investigators on November 13, 2023. As far as the government is aware, all of Mara's biological family members reside in Guinea, and his only family members in the U.S. are his in-laws. Mara's last known permanent residence was in Takoma Park, MD, but since returning to the United States in November 2023, he has been staying temporarily with his mother-in-law in New York. He does not own or rent any property in the U.S. When Mara's wife finishes her deployment to Burkina Faso, she will stay briefly in the U.S., then deploy again to Malawi. According to the Pretrial Services Report (at 1), Mara is currently unemployed. In short, Mara is not tied to any place, job, or person in the United States.

Mara's relationship with his wife and in-laws, as it relates to this case, is likely fragile. The Pretrial Service Report (at 1-2) indicates that Mara's brother-in-law may be willing to serve as a third-party custodian, but that he wished to speak to the defendant's attorney before agreeing to this. At the time he spoke to the Pretrial Services officer on June 10, 2024, Mara's brother-in-law (like Mara's newly retained attorney) knew little about the case. After the detention hearing, he will surely know much more. Mara's spouse, when interviewed by investigators on December 26, 2023, made clear she was under the misimpression that Mara had merely had an affair with their housekeeper. She stated she would be firing the housekeeper (which she later did) and that she believed the housekeeper "created this whole thing with the neighbor kids." Mara's wife has not had an opportunity to hear the minor victims' own allegations, nor is she aware of Mara's sexually

13

explicit WhatsApp conversations with MV-1, or his internet searches for child pornography. In addition, though not criminal in nature, Mara's cell phone also contains video evidence of numerous infidelities that appear to be recent. All of these details will emerge through this pleading, at the detention hearing, and over the discovery process. This Court should carefully consider whether Mara's support network will remain intact when these details become known to his wife and her family over the next few weeks.

While it is commendable that Mara surrendered himself to the U.S. Marshals, his cooperation thus far seems premised on his belief that he can talk (that is, lie) his way out of trouble. When Mara spoke with investigators in November 2023 and was confronted with his WhatsApp conversation with MV-1, he insisted he was chatting with an adult woman that he was trying to seduce. After a reverse proffer session with the government in early April 2024, Mara, through his then-attorney, provided a name and contact number for the woman with whom he claimed he had been exchanging WhatsApp messages. Investigators traveled to Ouagadougou, and on June 1, 2024, located that woman and interviewed her. She denied ever exchanging WhatsApp messages with Mara.

Mara has also tried to silence his minor victims, and at first, was successful. He was likely unaware, when he presented himself at the courthouse on June 10, 2024, that MV-1 and MV-2 had accused him of repeated forcible sexual assault. When Mara learns of the evidence against him

and considers the 30-year mandatory minimum sentences he is facing, his cooperativeness will likely be replaced with desperation, prompting him to flee to Guinea or elsewhere.[6]

### 4.  Nature and Seriousness of the Danger Posed by Release

As indicated above, the dangers posed by the Defendant's release are wide ranging and severe. Mara has a demonstrated sexual interested in early-adolescent girls. Considerable evidence shows that he repeatedly and forcibly sexually abused two such girls over the course of more than a year and has sought out child sexual abuse material depicting children of that age. Perhaps too obvious to state, the "nature" of the danger posed by Mara's release is that he will forcibly rape another child, the "seriousness" of which is difficult to overstate.

It is also very likely that Mara will attempt to obstruct justice by influencing the testimony of the minor victims, either directly or through their mother. At least one of the victims has a social media account through which Mara could contact her. And although Mara took the victims' cell phones away from them, their mother has her own phone, which Mara has used to communicate with her and send her money. The victims are abjectly poor, and even the hope of future financial benefits could dissuade them from testifying against Mara. Mara knows this and will likely attempt to contact the family and incentivize them not to further cooperate with U.S. authorities. Mara should not be afforded the benefit of the doubt, given that he has already tried numerous times in different ways to derail the investigation of his crimes.

Placing Mara in the custody of a third party is not an adequate safeguard. While Pretrial Services could potentially inventory and monitor Mara's current electronic devices, it would be impossible to reasonably assure Mara will not access other devices and use them to obstruct justice.

---

[6] The United States has no extradition treaty with Guinea. *See* 18 U.S.C. § 3181.

15

It is difficult enough to prevent inmates from using contraband wireless communication devices.[7] If Mara is not detained, he will have no difficulty finding a means of contacting the witnesses in this case and obstructing justice.

## IV.     CONCLUSION

For the reasons stated above, and for others presented at the detention hearing, there is no condition or combination of conditions that would assure the safety of the community or the Defendant's future appearance, and the Defendant should be detained pending trial.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I caused a copy of the foregoing to be filed with the Clerk of the Court using the CM/ECF system on June 13, 2024, which will send notification of such filing to all counsel of record.

Respectfully submitted,

Erek L. Barron
United States Attorney

By: /s/ Ranganath Manthripragada

Ranganath Manthripragada
Assistant United States Attorney

Adam Braskich
Trial Attorney

---

[7] *See* Federal Communications Commission, *Contraband Wireless Devices*, at https://www.fcc.gov/wireless/bureau-divisions/mobility-division/contraband-wireless-devices, last visited June 13, 2024 ("For decades, wireless devices, including cell phones, have been smuggled into correctional facilities nationwide.").