IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| v. | * | **CRIMINAL NO.** |
| | * | **8:24-cr-00187-LKG** |
| **FODE SITAFA MARA** | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| ****** | | |

**UNITED STATES'S RESPONSE TO DEFENDANT MARA'S
MOTION TO DISMISS THE INDICTMENT OR FOR A BILL OF PARTICULARS**

The United States, by and through the undersigned counsel, opposes Defendant Mara's motion to dismiss the indictment against him. The criminal offenses with which Mara is charged are applicable to his conduct in Burkina Faso. Each of the child exploitation offenses charged in Counts 1 through 6 applies to conduct committed within the special maritime and territorial jurisdiction of the United States (SMTJ). Mara committed the offenses from his Ouagadougou home, which falls within the SMTJ under 18 U.S.C. § 7(9)(B). Section 1512(c)(2) of Title 18, charged in Count 7, applies extraterritorially and therefore covers conduct regardless of where it occurred. Mara's alternative request for a bill of particulars with respect to Counts 1 through 6 should be denied because the indictment and discovery provided together adequately inform him of the allegations. His request should be denied as moot regarding Count 7, for which the government voluntarily provides a bill of particulars.

**PROCEDURAL HISTORY**

On June 6, 2024, a grand jury indicted the defendant on seven felony counts: five counts of Aggravated Sexual Abuse of a Minor in violation of 18 U.S.C. § 2241(c) (Counts 1, 2, 4, 5, and 6); one count of Coercion and Enticement of a Minor in violation of 18 U.S.C. § 2422(b) (Count

3) ; and one count of Obstruction of Justice in violation of 18 U.S.C. § 1512(c)(2) (Count 7). ECF 1. On June 10, 2024, the defendant had his initial appearance and was held pending a detention hearing. ECF 4, 6. On June 14, 2024, following a detention hearing, Magistrate Judge Ajmel Quereshi ordered Mara detained pending trial. ECF 13, 14. The Defendant has consented to tolling the speedy trial clock while he reviews the evidence the government has produced in discovery, and the clock is currently tolled through October 12, 2024. ECF 26. To date, the government has provided over 1,000 pages of documentary discovery, Bates-stamped FM_0001 through FM_1015, as well as voluminous digital discovery that includes the full contents of electronic devices and online accounts. On September 6, 2024, the defendant filed a motion to "dismiss the indictment for lack of jurisdiction or, in the alternative, for a bill of particulars." ECF 27.

## BACKGROUND

The allegations in this case are described in detail in the government's motion for pretrial detention. ECF 11 at 2-9. Relevant to the defendant's motion are the following facts:

Mara is married to an American woman who works for the U.S. Agency for International Development (USAID). In August 2022, Mara's wife began a two-year tour of duty in Ouagadougou, Burkina Faso. As her spouse, Mara was included on her official travel orders and accompanied her there. In October 2022, the couple moved into a house in Ouagadougou that was leased by the U.S. government for use by personnel assigned to U.S. diplomatic and other foreign missions. This is made clear by the lease agreement, attached as Exhibit 1,[1] which identifies the tenant as "THE UNITED STATES OF AMERICA, acting by David S. Stier, Contracting Officer of the Embassy of the United States of America at Ouagadougou." Ex. A at 1. It states that the premises are "to be used as a United States diplomatic establishment and for such other purposes

---

[1] All exhibits will be submitted to the Court for filing under seal.

as the TENANT may desire." *Id*. The lease term is listed as 10 years in length, from March 1, 2017, to February 28, 2027. *Id*. at 2. The lease also affords the tenant the right to "affix a flagstaff, a U.S. flag, a U.S. seal, and office signs and insignia on the Premises." *Id*. at 6.

The residence the Maras moved into in October 2022 is referred to by Embassy personnel, including security staff, as "R-12." Defendant Mara lived at R-12 until he left Burkina Faso in November 2023. All of the conduct charged in the indictment is alleged to have occurred inside R-12 while the Maras were residing there.

Minor Victim 1 (MV-1), born 2008, and Minor Victim 2 (MV-2), born 2009, are local Burkinabe girls who live close to R-12. Mara and his wife developed a close relationship with the victims and their family members. The victims disclosed to investigators that Mara began sexually abusing them as early as the second time they interacted with him. This included multiple instances of forcible sexual abuse.

One of the sexual assaults against MV-1, charged in Count 2 of the indictment, occurred on October 24, 2023. On that date, Mara sexually assaulted MV-1 in the housekeeper's quarters of R-12. He used a condom and discarded it in the housekeeper's toilet but forgot to flush it. The housekeeper, who had already voiced suspicions about Mara's conduct toward MV-1 and MV-2, discovered the condom the next day. She reported this to Embassy security personnel, who seized the condom.

Mara then left the country on a trip with his wife, but when he returned, federal law enforcement agents with the U.S. State Department approached him at the U.S. Embassy, interviewed him, and seized some of his electronic devices. On one of Mara's phones, investigators found evidence that Mara had sexually explicit conversations with MV-1 via WhatsApp while Mara was traveling abroad. That conversation continued via text message when Mara returned to

Burkina Faso. On November 12, 2023, Mara texted MV-1 that he was at home and wanted to spend the whole night with her but that it would have to wait until his wife was out of town. GPS evidence confirmed that Mara was at R-12 when he sent that message. Mara's message, which attempted to entice MV-1 to engage in sex with him, forms the basis for Count 3 of the indictment, charging a violation of 18 U.S.C. § 2422(b).

When investigators interviewed Mara, they confronted him about the condom found in his housekeeper's toilet. He claimed he was having an affair with his housekeeper and that the condom was from sex he had with her. After speaking with Mara at the Embassy, investigators accompanied him back to R-12 to examine some of his electronic devices. The housekeeper was at R-12 when they arrived. After the investigators left, Mara spoke to the housekeeper and asked her to lie and tell others that the two of them were having an affair and that the condom found in the housekeeper's toilet was from sex they had together. The housekeeper told Mara she would not lie for him and reported the event to Embassy security personnel. Mara's attempt to persuade the housekeeper to lie on his behalf and help him cover up his sexual assault of MV-1 forms the basis for Count 7 of the indictment, charging a violation of 18 U.S.C. § 1512(c)(2).

When MV-1 and MV-2 first spoke to investigators, they denied that Mara acted inappropriately with them, but eventually, they began to reveal the truth about what Mara had done. On May 30-31, 2024, MV-1 and MV-2 disclosed in detail the sexual abuse that Mara committed against them. These sexual assault allegations are summarized in the case agent's reports. Five specific sexual assaults form the bases for the aggravated child sexual abuse charges

4

under 18 U.S.C. § 2241(c) that are contained in Counts 1, 2, 4, 5, and 6 of the indictment. All of those sexual assaults occurred in R-12.

## APPLICABLE LAW

### I. Extraterritoriality

"Congress has the authority to apply its laws, including criminal statutes, beyond the territorial boundaries of the United States." *United States v. Ayesh*, 702 F.3d 162, 166 (4th Cir. 2012) (quoting *United States v. Dawn,* 129 F.3d 878, 882 (7th Cir.1997)). However, courts recognize "a presumption against extraterritoriality" and will find a statute to apply to foreign conduct only if "Congress has affirmatively and unmistakably instructed that the statute will do so." *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 335 (2016). If the statute in question gives a "'clear, affirmative indication that it applies extraterritorially,'" the presumption is rebutted, and the court need look no further. *Roe v. Howard*, 917 F.3d 229, 240 (4th Cir. 2019) (quoting *RJR Nabisco*, 579 U.S. at 338-340).[2] On "numerous occasions," Congress has "expressly legislated the extraterritorial application of a statute." *E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, 258 (1991). "In fact, the criminal code is replete with examples of unambiguous congressional intent to apply U.S. law overseas." *United States v. Corey*, 232 F.3d 1166, 1185 (9th Cir. 2000).

Some criminal statutes contain a provision expressly stating that the law applies extraterritorially. The obstruction of justice statute, 18 U.S.C. § 1512, contains such a provision at § 1512(h). It reads, "There is extraterritorial Federal jurisdiction over an offense under this

---

[2] If the initial inquiry does not show that a statute applies extraterritorially, a court must proceed to the second step, which is to "'determine whether the case involves a domestic application of the statute' by considering the challenged conduct in light of the statute's 'focus.'" *Id*. (quoting *RJR Nabisco*, 579 U.S. at 337). This step is not implicated here, because the extraterritorial reach of the statutes at issue is clear from their plain text.

5

section." This statement "codif[ies] Congress' intent that extraterritorial jurisdiction be applied regardless of where the offense occurs." *United States v. Bocachica*, 57 F. Supp. 3d 630, 632 (E.D. Va. 2014).

Other criminal statutes proscribe conduct within the SMTJ, and it is by operation of the SMTJ statute, 18 U.S.C. § 7, that they may be applied extraterritorially. As relevant here, 18 U.S.C. §§ 2241(c) and 2422(b) both apply to conduct within the SMTJ. The SMTJ statute "extends the jurisdiction of the federal criminal laws to areas where American citizens and property need protection, yet no other government effectively safeguards those interest" and "reflect[s] a legislative purpose to reach places that lie well beyond U.S. borders." *Corey*, 232 F.3d at 1171. In particular, 18 U.S.C. § 7(9) provides that "[w]ith respect to offenses committed by or against a national of the United States as that term is used in section 101 of the Immigration and Nationality Act," the SMTJ includes the following:

> **(A)** the premises of United States diplomatic, consular, military or other United States Government missions or entities in foreign States, including the buildings, parts of buildings, and land appurtenant or ancillary thereto or used for purposes of those missions or entities, irrespective of ownership; and
>
> **(B)** residences in foreign States and the land appurtenant or ancillary thereto, irrespective of ownership, used for purposes of those missions or entities or used by United States personnel assigned to those missions or entities.

As the Fourth Circuit recognized in *United States v. Passaro*, § 7(9) "*expressly* applies to 'premises ... in *foreign States*,' . . . thus, Congress intended § 7(9) to reach extraterritorially." 577 F.3d 207, 216 n. 3 (4th Cir. 2009) (emphases in original).

A "claim about the extraterritorial reach" of a criminal statute "is a merits question, not a question of jurisdiction." *United States v. Harris*, 991 F.3d 552, 557 (4th Cir. 2021). *See also Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 254 (2010) ("[T]o ask what conduct § 10(b) reaches is to ask what conduct § 10(b) prohibits, which is a merits question. Subject-matter

6

jurisdiction, by contrast, refers to a tribunal's power to hear a case.") (internal quotations omitted).

## II. Indictment and Bill of Particulars

"A valid indictment must: (1) allege the essential facts constituting the offense; (2) allege each element of the offense, so that fair notice is provided; and (3) be sufficiently distinctive that a verdict will bar a second prosecution for the same offense." *United States v. Bolden*, 325 F.3d 471, 490 (4th Cir. 2003). "As a basic proposition, an indictment is sufficient if it alleges an offense in the words of the statute." *Id.*

"A motion for a bill of particulars is addressed to the sound discretion of the trial court." *United States v. Anderson*, 481 F.2d 685, 690 (4th Cir. 1973). Such a motion should be granted if the indictment "fails to adequately inform the defendant of the charges against [him]," including "if certain portions of the indictment are so general that they do not advise a defendant of the specific acts that []he must defend against." *United States v. Mosby*, No. 22-CR-00007-LKG, 2022 WL 1120073, at *3 (D. Md. Apr. 14, 2022). However, "if the indictment—and information provided by the Government through full discovery—is sufficient to enable a defendant to obtain necessary information about the nature of the charges against h[im], so that []he may prepare for trial, a bill of particulars is unnecessary." *Id*. *See also United States v. Najera*, 585 F. App'x 185, 185 (4th Cir. 2014) (unpublished) (affirming denial of motion for bill of particulars where government had provided defendant with "full discovery" and he "failed to show he suffered any unfair surprise").

## ARGUMENT

The Defendant makes his motion for dismissal pursuant to both Fed R. Crim P. 12(b)(2), challenging this Court's jurisdiction, and pursuant to Fed. R. Crim. P. 12(b)(3)(B)(V), alleging the indictment is defective for failing to state an offense. ECF 27 at 5-6. In support of both arguments

for dismissal, he claims (at 11-12) that Count 7, charging obstruction of justice, does not apply extraterritorially, and (at 13-14) that the charges in the remaining counts do not apply to *his* alleged foreign conduct because he is not covered by the SMTJ statute.

The defendant's claims do not implicate this Court's jurisdiction. "'Subject-matter jurisdiction in every federal criminal prosecution comes from 18 U.S.C. § 3231, and there can be no doubt that Article III permits Congress to assign federal criminal prosecutions to federal courts. That's the beginning and the end of the 'jurisdictional' inquiry.'" *United States v. Hartwell*, 448 F.3d 707, 716 (4th Cir. 2006) (quoting *Hugi v. United States,* 164 F.3d 378, 380 (7th Cir.1999)). Meanwhile, "[p]ersonal jurisdiction over a criminal defendant is established by the presence of the defendant before the court." *United States v. Harris*, 991 F.3d 552, 557 (4th Cir. 2021). A "claim about the extraterritorial reach" of a criminal statute, is, rather, "a merits question" – a question of what conduct the criminal statute prohibits. *Id*. Therefore, "what is at issue here is not, in fact, a matter of jurisdiction, at least in the formal – rather than colloquial – sense of the word." *Id*. *Cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998) ("Jurisdiction ... is a word of many, too many, meanings." (internal quotation marks omitted)).

As explained below, all of the charges in this case apply to the Defendant's alleged conduct in Burkina Faso, and the Defendant's motion for dismissal for failure to state an offense must be denied (regardless of whether his claim is jurisdictional in nature). His alternative motion for a bill of particulars should also be denied as moot regarding Count 7 and as meritless regarding the other counts.

I.      **Count 7 (Obstruction of Justice) applies extraterritorially.**

Count 7 of the indictment charges the Defendant with violating 18 U.S.C. § 1512(c)(2). Section 1512 contains an express extraterritoriality provision in § 1512(h), which reads, "There is

8

extraterritorial Federal jurisdiction over an offense under this section." In support of Count 7, the government alleges that on or about November 13, 2023, Defendant Mara attempted to persuade his housekeeper to lie to federal law enforcement officers and others by claiming she and Mara had an extramarital affair and that a condom that investigators recovered from Mara's residence on October 25, 2023, was used during sex between Mara and the housekeeper. In doing so, the Defendant attempted to corruptly obstruct, influence, and impede a foreseeable federal grand jury investigation into the criminal conduct alleged in Count 2 of the indictment – the sexual assault against MV-1 during which Mara actually used the condom.

Mara's conduct constitutes a violation of § 1512(c)(2) even though it occurred in Burkina Faso. The indictment alleges that the conduct underlying Count 7 occurred "within the Special Maritime and Territorial Jurisdiction of the United States in Ouagadougou, Burkina Faso." This is accurate, because the conversation between the Defendant and his housekeeper took place inside the R-12 residence. However, the government's inclusion of the SMTJ language in the indictment is extraneous. Section 1512 is not tied to the SMTJ; rather, it contains a broad extraterritoriality clause and can therefore "be applied regardless of where the offense occurs." *Bocachica*, 57 F. Supp. 3d at 632. *See also United States v. Fisher*, 494 F.3d 5, 8-9 (1st Cir. 2007) (court had jurisdiction over defendant charged under § 1512(a)(1)(A) with soliciting the murder of a cooperating federal witness located in Canada, holding that "subsection (h) of § 1512 specifically provides for extraterritorial federal jurisdiction, and therefore, that the murder was to have taken place in Canada is of no moment.").

The Defendant's claim (at 12) that 18 U.S.C. § 1512 "contains no…extraterritorial clause" is contradicted by § 1512(h), which makes the statute applicable to conduct committed anywhere

9

in the world, including Burkina Faso. The Defendant's motion to dismiss Count 7 should therefore be denied.

## II.     Section 7(9)(B) of Title 18 places the Mara residence squarely within the SMTJ.

The defendant incorrectly claims (at 16) that 18 U.S.C. § 7(9)(B) cannot apply to his conduct because he was not the "personnel assigned" to a U.S. foreign "mission[] or entit[y]" who used the R-12 residence; rather, his wife was. As an initial matter, there appears to be no dispute between the parties that Mara's spouse, a USAID employee, was "personnel assigned" to a U.S. foreign mission or entity, and that the R-12 residence was "used by" her. *See* ECF 27 at 16 and Exhibit B (Mara Assignment Cable), also attached here as Exhibit 2. But the Defendant misreads § 7(9)(B) in claiming that the statute does not reach him because he was not the assigned personnel.

Simply put, the plain text of § 7(9)(B) shows that the United States's special jurisdiction is over the "residences," not the "personnel." As the Fourth Circuit explained in *United States v. Passaro,* 18 U.S.C. § 7 "makes the *site* of the offense an element of the crime." 577 F.3d 207, 212 (4th Cir. 2009) (emphasis in original). The *Passaro* court bolstered this conclusion with respect to § 7(9) by examining its legislative history:

> Congress enacted § 7(9) at least in part to "explicitly extend" § 7's extraterritorial reach to "U.S. diplomatic and consular **premises**" overseas—that is, to fixed **locations** . . . . *See Administration's Draft Anti–Terrorism Act of 2001: Hearing Before the H. Comm. On the Judiciary,* 107th Cong. 44 (2001). Similarly, the House Judiciary Committee report interpreted this legislation as reaching "crimes committed at United States *facilities* abroad." H.R.Rep. No. 107–236, at 73 (2001) (emphasis added).

*Id*. at 214 (bold added, italics in original). The R-12 house is a "residence" that was both "used for purposes of" and "used by personnel assigned to" U.S. foreign missions and entities. 18 U.S.C. § 7(9)(B). This is evident from the lease, which contemplates R-12's use "as a United States diplomatic establishment" and specifically allows for installation of a U.S. flag. Ex. 1 at 1, 6. The

lease term is 10 years, extending well before and after the Maras' stay at R-12, showing that the residence has been utilized by various U.S. personnel. Ex. 2. At the time of the offenses charged in the indictment, the residence was plainly being "used by" Mara's spouse. All of this establishes that the United States's special maritime and territorial jurisdiction extends to the R-12 *residence*, which is where the crimes in this case allegedly occurred.

Notably, § 7(9) *is* limited with respect to the people involved in the offense, but not as the Defendant argues. The opening clause of § 7(9) limits the subsection to "offenses committed by or against a national of the United States . . . ." Therefore, Congress knew how to limit the SMTJ's reach with respect to those involved in the offense, and it chose to do so with respect to nationality but not with respect to who is or is not assigned to a U.S. foreign mission or entity. So, for example, U.S. federal law would reach an offense committed by a Burkinabe national against Mara or his spouse inside of their home. Or, as here, the SMTJ extends to offenses committed inside of R-12 by a U.S. national (Mara) against Burkinabe nationals (MV-1 and MV-2).

**III.    No bill of particulars is warranted for the child exploitation counts.**

The Defendant states (at 11) that "the language of the indictment makes no mention of where the offenses allegedly occurred . . . other than to say that . . . the event occurred 'within the Special Maritime and Territorial Jurisdiction of the United States in Ouagadougou, Burkina Faso'" and claims that this provides him with "insufficient information" as to why the SMTJ would apply. The government maintains that the language of the indictment is sufficient to put the defendant on notice of the charges against him. But even if it were not, the discovery the government has provided to the Defendant makes abundantly clear that the child exploitation offenses allegedly occurred within the R-12 residence, and that the residence falls within the SMTJ by virtue of 18 U.S.C. § 7(9)(B). Accordingly, no bill of particulars is warranted.

11

With respect to the physical child sexual abuse charges in Counts 1, 2, 4, 5, and 6, the government's discovery includes summaries of interviews with MV-1 and MV-2. The victims told investigators that each assault occurred inside the R-12 residence. The relevant summaries of interviews of MV-1 and MV-2 are attached here as Exhibits 3 and 4 and were provided in discovery as FM_1016-FM_1018 and FM_0389-FM_0390, respectively.[3] For purposes of this pleading, the government has highlighted the language showing that the events occurred at R-12. Exhibits 3-4 show the following:

- Count 1: Mara called MV-1'a mother and told her to send MV-1 to "Mara's house." MV-1 arrived, and Mara eventually brought her to a bedroom where he sexually assaulted her.

- Count 2: Mara picked MV-1 up from school and told her he needed to stop at "his house" for something. Both went inside the house, and Mara then brought MV-1 to a bedroom where he sexually assaulted her.

- Count 4: MV-2 went to "Mara's residence," and Mara brought MV-2 to a bedroom and sexually assaulted her.

- Count 5: MV-2 went to "Mara's house," and Mara brought MV-2 into the kitchen pantry, where he sexually assaulted her.

- Count 6: Mara asked MV-2 to come to "his house," and when MV-2 arrived, Mara had her sit next to him on the living room couch, where he sexually assaulted her.

As for the enticement charge in Count 3, the government has provided the defendant with the digital evidence from Mara's cell phones, which shows that on November 12, 2024, he told MV-1 he was at home ("je suis a la maison") and shortly after told her he wanted to spend the whole night with her but that it would have to wait until the following day, when his wife would be out of town. GPS evidence, also contained on the devices provided in discovery, confirms that

---

[3] The document originally produced as FM_1016-FM_1018, which details the assaults against MV-1, contained the name "MV1" in the file name and heading. However, the body of the report erroneously referred to MV-1 as MV-2. The version attached to this filing has been corrected, and a corrected version will be separately provided to defense counsel.

Mara was at the R-12 residence when he sent the enticement message.

The discovery also includes evidence that the R-12 residence meets § 7(9)(B)'s criteria for the SMTJ – namely, the lease and assignment cable, attached here as Exhibits 1 and 2. Other discovery also makes clear that the government is relying on § 7(9)(B) to establish that the events took place within the SMTJ. For example, a search warrant affidavit provided in discovery states the following at FM_0158:

> The evidence to be search[ed] was seized from MARA's residence, which has been leased by the United States government for the residential use of employees working at the U.S. Embassy while assigned in Burkina Faso since at least 2018. MARA and his wife . . . moved into the residence sometime after their arrival in Burka Faso in August of 2022. . . . . [T]his residence falls under the Special Maritime and Territorial Jurisdiction of the United States, pursuant to Title 18, United States Code, Section 7(9)(B).

Another search warrant affidavit provided in discovery provides the following at FM_0181:

> [Spouse's first name] and Fode Mara are assigned to Embassy residence R-12 (640), which is a residence leased by the U.S. government. The residence falls under the Special Maritime and Territorial Jurisdiction of the United States, pursuant to Title 18, United States Code, Section 7(9), which covers "premises of United States diplomatic, consular, military, or other United States Government missions or entities in foreign States," and "residences in foreign States . . . irrespective of ownership, used for purposes of those missions or entities or used by United States personnel assigned to those missions or entities."

Taken together, the indictment and the discovery provided to the Defendant give him adequate notice of the charges against him, making a bill of particulars unwarranted. *Mosby*, 2022 WL 1120073, at *3 ("if the indictment—and information provided by the Government through full discovery—is sufficient to enable a defendant to obtain necessary information about the nature of the charges against h[im], so that []he may prepare for trial, a bill of particulars is unnecessary.").

13

**IV.    The government's voluntary bill of particulars regarding Count 7 moots the defendant's request.**

The government maintains that the indictment language of Count 7 provides the defendant with adequate notice of the nature of that charge. However, given the minimal clarification that the defendant seeks, the government voluntarily provides a bill of particulars, to be filed separately. That bill of particulars clarifies that Count 7 charges the Defendant with attempting to persuade his housekeeper to lie to federal investigators and others by falsely stating that she was having an affair with the Defendant and that the condom recovered from the housekeeper's toilet on October 25, 2023, was used during sex between the housekeeper and the Defendant. By attempting to persuade his housekeeper to lie about the condom, Mara attempted to corruptly obstruct, influence, and impede an official proceeding – specifically, a foreseeable federal grand jury investigation into the criminal conduct alleged in Count Two of the indictment (a sexual assault against Minor Victim 1 occurring on or about October 24, 2023).

Given the clarification provided in the government's voluntary bill of particulars, the Defendant's motion with respect to Count 7 should be denied as moot.

## CONCLUSION

For the reasons stated above, the Defendant's motions for dismissal of the indictment and for a bill of particulars should be denied.  Respectfully submitted,

> Erek L. Barron
> United States Attorney
>
> By:  /s/ Ranganath Manthripragada
> Ranganath Manthripragada
> Assistant United States Attorney
>
> Adam Braskich
> Trial Attorney, DOJ-CEOS

14

**EXHIBITS 1-4 TO BE FILED SEPARATELY UNDER SEAL**

## CERTIFICATE OF SERVICE

    I, Adam Braskich, HEREBY CERTIFY that a copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all counsel of record, on September 20, 2024.

                                    /s/ *Adam Braskich*
                                    Adam Braskich
                                    Trial Attorney, DOJ-CEOS